Mr. Van Alstyne was convicted of running a Ponzi scheme, but he wasn't sentenced for fraud. His sentence was driven by his conviction on three money laundering counts. Alleged money laundering was based on transactions that were a normal part of the underlying scheme to defraud. The Supreme Court's recent decision in United States v. Santos establishes that such transactions do not constitute money laundering. Because Mr. Van Alstyne's case is not yet final, Santos must be applied here. The first question is, what is the holding of Santos? Before you jump to Santos, the conviction and sentence goes up on appeal to the 9th Circuit. The conviction is affirmed, and it's remanded for resentencing, right? Correct. And while it's backed down in district court for resentencing, Santos comes along. No, the case is already up on appeal when Santos is decided. Well, it's backed up from the resentencing? Yes. But the conviction's done, right? The conviction's done, but the case is not final. Under this Court's holding in Lafromboise and Colvin, a case isn't final until everything is final. And so I think the fact that this case went up once before and came down is besides the point as far as applying the new rule of Santos to this final case. Does it make any difference in this regard that the Ammaline remands were kind of pecu -- remands? And there has been case law since, as you know, taking a very narrow view of what those remands were. They were – what they were originally was essentially asking the district court for advice as to whether or not there was prejudice with regard to the sentencing. So they were not – it seems to me they're open to the interpretation that the conviction was really final, final at that point, and not just final in the usual sense. I disagree for two reasons, Your Honor. First of all, I think that the Griffith rule would apply even on an Ammaline remand because the rule states that no matter where you are in the process, if it can – if the case isn't final, and this Court has said the case means everything, then you apply the new rule. What's more, in this particular case, while the Ammaline remand is limited initially to – for the court to make the call as to whether or not to reopen the resentencing, here we did have a full resentencing. So it's really no different from this Court vacating the order itself. Do you have any case in which we've done this, reopened a question, a conviction once affirmed because of a change in the underlying law regarding the conviction, which I want to talk about in a minute, or which you want to talk about in a minute, after everything was done for the sentencing? No, I haven't found a case directly on that point. But I think that the – And then you have the additional problem that the new rule is not exactly lucid, to put it mildly, which is, I guess, what you want to get to now. Yes, Your Honor, unless the Court has any other questions on the point of finality. But does it matter to the – if you're otherwise right, does it matter to the application of the law of the case that we would really have to make a rule? There isn't really a rule in the Supreme – I mean, the best you could say about the Supreme Court opinion is it upset our prior law in some way. No, Your Honor, I actually disagree with that. I think that Justice Stevens' decision does set forth a clear rule, and if I may, I'd like to get to that. Okay. What is it? The fourth justice plurality concluded that for purposes of the money laundering statute, the term proceeds always means post-expense profits, not gross receipts. Justice Stevens concurred in the judgment, but on narrower grounds. He agreed that the rule of lenity applies to make proceeds mean profits, except under some limited circumstances where there's clear congressional intent to make proceeds mean receipts. Thus, Justice Stevens' opinion is a logical subset of the pluralities, because whenever proceeds means profits under his – his opinion, five justices will agree that proceeds means profits because the four justices in the plurality believe it always means profits. Therefore, under Marx versus the United States, Justice Stevens' concurrence is the binding precedent of Santos. So the court must apply that position here to figure out whether proceeds means profits in Mr. Weinolstein's case. Justice Stevens agreed with the plurality that the term proceeds in section 1956 is ambiguous, so his goal was to try to fill in that gap. And in doing so, he talked about two things. First, he concluded that the legislative history of the statute makes it clear that Congress intended proceeds to mean receipts from the sale of contraband in an organized crime cases involving such sales. He also concluded that in Act of 1956, Congress could not have intended the perverse result of the merger problem, so in cases presenting that kind of problem, he would agree with the plurality's conclusion that the rule of lenity applies and proceeds means profits. Justice Stevens said that in applications of the money laundering statute not involving such a perverse result, he presumed that the legislative history reflects the intent of Congress. The government reads Justice Stevens' opinion to mean that proceeds means receipts in contraband and organized crime cases, and also in any case that doesn't present the merger problem. In all other cases, proceeds means profits. It would be helpful to me to jump a little bit to the actual application of the rule of lenity, or let's assume you're right about the Justice Stevens' rule, or even the majority rule, to the facts of this case. In this case, the crime isn't committing – isn't participating in a Ponzi scheme. In other words, in Santos, the crime is running an illegal lottery, so everything having to do with the lottery is part of the crime. Here, the crime is mail fraud, right? Not – there is no crime of committing a Ponzi scheme as such. Not exactly, Your Honor, because if Your Honor looks at the indictment, what was alleged was a two-and-a-half-year scheme to defraud, and the government laid out its theory about what the scheme was, and that is the Ponzi scheme, and then the counts were based on the element of a mail fraud offense that requires a mailing incentive. And by the way, here are 19 mailings that happened during this overarching scheme to defraud, and we're counting on those to be the last element for these mail fraud counts. But the mail fraud – But the misrepresentation – I mean, the paying of the people back with some money from the scheme was in no way essential, as I understand it, to the mail fraud that occurred. I mean, in other words, if you had just – if you said to these people, we have a whole lot of – we're buying a lot of – we're putting all the money in gas and oil leases, and we're making from that 10 percent, 13 percent return, and so on, that was just not true, and it would have been mail fraud without the – it would have ended a lot earlier, because presumably people wouldn't have gotten money back, and that would have been the end of it. But it wasn't essential to the mail fraud crime as such, right? I disagree, Your Honor. If you look at the mail fraud statute, part of the statute, one of the elements, is a scheme to defraud. Just mailing something in isolation doesn't constitute mail fraud unless it's connected to the scheme to defraud. And the government here said what the scheme to defraud was, and it wasn't an isolated incident. It wasn't he said something fraudulent on this day, and this mailing is connected with that, and that's a small little incident. The scheme to defraud, as pled in the indictment and as proved by the government at trial, is a two-and-a-half-year scheme, commonly called a concession. But I guess what I'm trying to say is it's not inherent in the statute, the way the lottery – in terms of this merger problem, it isn't – I don't know where this leads to, but it's not inherent in the statute in the same way. It's not – you're not creating a situation in which Congress couldn't have meant this, because the – they created a crime which would completely overlap with a broader view of proceeds. I don't think so, Your Honor. In fact, even the dissent looked at the fraud statute and says, we see problems with the fraud statute because, for example, the unlawful activity in mail fraud is a scheme to defraud, not the individual mailings carried out in furtherance of the scheme. In such a case, what will constitute the single instance of unlawful activity? So it thinks that if the majority rule, the plurality plus Stevens rule applies in a fraud case, then you do have the same problems that arise in a – in a gambling case like Santos's. And I think that a fraud is the act of taking the money away. Now that you subsequently use the money to seed your future fraud isn't an inherent element of the fraud in the first instance. I disagree with that, Your Honor, because, again, it – the plurality suggested that one way the government can deal with its decision is to engage in some creative pleading. And I don't know if in some future case the government might be able to take a Ponzi scheme like this and creatively come up, plead an indictment where you can take one part of it and say here's a fraud and it had profits and the profits were used over here to promote further fraud. That's for another day. That's not how this was alleged and proved. But it's your understanding of the majority opinion in Santos that if the – if they had run a lottery on day one, one lottery, right, and made a bunch of money and then had taken the money from that lottery to see the next lottery, would that have violated the statute or not? I think, under Justice Scalia's decision, if the government had carefully pled it in that way, said this – this first count is a – It's lottery on day one. Lottery A. Right. And then money laundering occurred when they used the profits from Lottery A to then finance Lottery B. That, I think, is the kind of thing that Justice Scalia and the other people who joined in the plurality were contemplating of ways around – So you're essentially saying in this case, too, you could have pled it in pieces, but they didn't plead it in pieces. Well, they didn't – I'm also not sure how they could. I mean, I'd like to see how they tried. But, I mean, when you have a Ponzi scheme like this – I don't think you would. I don't think so either, Your Honor. But in a Ponzi scheme like this, it all is of a whole. You can't separate it when you're – But it's not, necessarily. I mean, you can scam the first guys and be done with them. I mean, you just don't invest the money in oil and gas. You go off and do something else with it. If you want to keep it going, if you want to raise more money, then you have to feed it back in. But isn't the unlawful action complete when you scam the first set of investors? I think potentially it could be complete. I just don't know that if somebody were to try to take this Ponzi scheme and say, well, where is an ending point and where is a new starting point? I don't know how that would happen, given that the thrust of the Ponzi scheme was to get investors in later so you can have money to pay the investors who came in earlier. Well, it's only if you're going to keep it going. At some point in time, you can't keep it going. You don't have to keep it going. If you've got enough money, you've scammed out the first time. You just skip. Correct. And then there would be an ending point and there would be a period where you would know what the profits were. And that's not to say that this alleged scheme didn't have profits. The government points to things in the record saying, you know, Mr. Van Alstyne took this salary and bought a house and bought a pool. And I think it even uses the word profits. Those kind of things are legitimately viewed as profits. Should that affect us if we're acting under a plein air standard? Is there injustice here if, in fact, there were profits? Well, first of all, I don't think the Court is acting under a plein air standard because Mr. Van Alstyne made Rule 29 motions that were preserved. So I think the insufficient evidence argument is not on plein air. The jury instruction issue is on plein air. But I don't think that that is something that the Court can uphold the convictions on. Do you want to save some time for rebuttal? Yes. Thank you. Thank you. Thank you for your argument. We'll hear from the United States at this time. Mr. McCormick. Good morning, Your Honor. It's my pleasure to court. Doug McCormick for the United States. I'd like to start with talking a little bit about a normal scheme to defraud and to follow up on a point Justice Clifton made, which is in a normal scheme to defraud, the defendant could have skipped. And the question is whether these payments, these payments which the defendant argues merged, were really necessary expenses. I think in Santos, it was clear that paying the winners in the lottery, the people who won, those were necessary expenses to be able to reimburse. Well, here, as the scheme was alleged, and I think you might be able to draw a line between the payments that purported to be regular payments under the alleged these purported investment and the payments that were returned to complainers. I suppose the second is probably not an ordinary part of the scheme, but the first, it seems, is. It is a ordinary part of a Ponzi scheme or a potential Ponzi scheme, Your Honor, but it's not an ordinary part of an ordinary scheme to defraud. In other words, not every fraud scheme necessarily involves. Well, that's what you were saying before, but you did allege it this way. You allege, as I understand the government's position in mail fraud cases, is it doesn't, it's not the individual misrepresentations that matter, it's the scheme. And the scheme you allege did have this return in it because, and otherwise you'd have to go and start piercing, and I don't even know how you begin to do it, the particular frauds that were relied on to see how far down the line they were. Right? I mean, in other words, if you had people, if the particular mailings that you relied on were after some number of purported returns and that was part of why these people were investing, then it would matter that there were purported returns. And I don't know whether they were or weren't, whether they were at the beginning or toward the middle or toward the end. Well, the returns are all toward the end. I mean, the fraud scheme was roughly from the beginning of 1992 to the end of 1994. And what about the particular mail frauds of which was convicted? The mail frauds, I think, extend throughout the whole period. I think the mail frauds start in 1992 and go through 1994. Wasn't he acquitted of a bunch of them, though? I'd have to look at which ones he was acquitted of and which ones he wasn't. Right. We don't know. So they may matter and they may not matter, and certainly it's not a lie anybody drew here or that anybody litigated or anything else. With respect to the scheme of the fraud, though, I think there's a, at least in my mind, it's important to note that the scheme of the fraud involved more than just these payments to existing investors. And I want to make another point about those in a moment. But, you know, there were a number of misrepresentations made. There was a misrepresentation made that these funds would be invested in an income program dealing with the transportation of natural gas. That was a lie. The funds weren't used for that. Some of them were. Most of them were not. It's also said that you could have won this case in a different ground, but you didn't plead it that way because you didn't think you had to. I mean, the whole problem here is that we're dealing with a very interesting case that came that way down the line. So you didn't think you needed to and you didn't. Absolutely. And I don't mean to get the horse in front of the cart. I mean, one of our arguments here is the Court should not reach this issue because the law of the case prevents it. Actually, the horse normally does come before the cart, but go ahead. Fair enough, Your Honor. The law of the case would prevent this Court from reaching this unless there has been some intervening change in the law. And what we have here, really, is Santos giving the defendant a new legal argument. There has been no change in the law yet with respect to anything beyond the holding in Santos. The holding in Santos was limited to money laundering in the context of an illegal gambling enterprise. This Court and the circuit courts across the country are going to have to try to figure out what to do with the 4-4-1 split. Conceptually, there's been a change in the law. Our law was that it's always the proceeds that matter and now the rule is not so fast. So it's a different rule. We don't know what the rule is, but it's not the same rule that we had before. So the question is, for law of the case purposes, how much of a change does there have to be? Does it have to be directly on point or does it have to reopen the inquiry? And that's a good question, Your Honor, and perhaps that's the ultimate question for this Court to struggle with. I think what the prior precedent of the Court holds is that there has to be an intervening change in the law. And here I would submit that what we have, really, is a basis for an argument for the defendant that here proceeds should mean profits. What about for stare decisis purposes? Suppose we didn't have a law of the case problem in this case. We have three judge panels in this Court that have, I don't think there's one on Ponzi schemes, but have made certain assumptions about the law as we have this muddled Supreme Court case. What would a three-judge panel do just with regard to stare decisis? If this case had, if we were back several years and we didn't have the law of the case problem in this case, what would we do then? Ultimately, then I think it would be this Court's job to look at the opinion in Santos and try to apply it to the facts here. And I think... Even though we had prior case law which the answer would have been clear. Correct. So why is the law of the case different? That's what I'm trying to understand. Why is the law of the case rule about... So ultimately you're arguing the law of the case rule about changed law is different than the stare decisis rule with regard to changed law. Well, I suppose what I'm arguing is that at some point the mandate that issued, the mandate that issued when the prior three-judge panel sent this case back to the district judge for an amyling remand, which ultimately became a full re-sentencing, that mandate had a narrowing feature to it. Suppose the Supreme Court said whatever the individual was convicted of wasn't a crime. Maybe it was beyond Congress's Congress power or whatever. Is there any doubt that a subsequent panel of this Court would wind up saying, well, you can't hold somebody for something that's not a crime, so... I would agree with that. Why is this different? Simply because we don't know what the rule is with respect to a money laundering offense that involves an underlying fraud scheme. We know for an illegal gambling enterprise. We don't know what the rule is with respect to a mail fraud scheme like this one. If Santos had been 9-0, Justice Stevens writing the opinion, same language, would your approach be any different? We would then have to look at Justice Stevens' opinion and try to understand what he would do with this case. And I think the important part of Justice Stevens' opinion with respect to this case is the merger problem. And here, these payments to these investors do not merge with the underlying offense. The defendant had the money and he had defrauded the investors once he got their money. He could have at that point gone. The revenue generated by a gambling business that is used to pay the essential elements of operating that business is not proceeds within the meaning of the money laundering statute. That's exactly what he said. And I would argue that these are not the essential expenses of the fraud scheme. You don't have to pay existing investors. You can take the money and walk away. You have to pay the winners in a lottery or you don't have an illegal gambling enterprise for very long. Here, you don't have to pay the existing investors. You don't have to try to go back to victim A and say, hey, we're making you these monthly payments. It's been working out great. Wouldn't you like to make another $100,000 investment? But that's what the defendant did. Essentially, it's even a more specialized kind of Ponzi scheme. It's a reload Ponzi scheme where he's trying to take his old investors and hit them again and hit them again and hit them again. And the evidence of trial shows that he did that. And these promotional payments to these defendants, which is why they were charged with promotional money laundering, enabled him to do that. And that's a very different circumstance than the payments to the winners in Santa. I would also note, as an additional matter, the transfers, the underlying transfers in question, weren't even the transfers to the victims themselves. They were the transfers from an account controlled by the defendant into a distribution account. So he, in other words, he had the monies in what was called the Blake Energy account, which was his account. It was monies he was supposed to use to buy oil and gas properties. He wasn't doing it the way he was supposed to do it. He transferred that money into the oil and gas limited partnership distribution accounts so that when these investors got these checks, they would think that they were distributions from the ownership of oil and gas. But doesn't that prove that it is inherent in the criminal scheme? Again, I don't think it's necessary to the criminal scheme for him to have set it up this way. He could have simply kept the money in the Blake Energy account. He didn't have to do it this way. He didn't have to hit up existing investors. He simply could have kept hitting up new investors. Or he could have hit up... But it wouldn't have worked for very long. That's why the scheme was alleged the way it was alleged. It was much more successful because there were returns. And I guess I would submit, Your Honor, that it can't be the rule that there's a difference between fraud schemes that involve payments to existing investors and fraud schemes that don't. It's either... There's either a merger problem or there isn't. And here, there's no payment of necessary expenses. There may be some necessary expenses to a fraud scheme. Bernie Madoff wouldn't have done very well if he didn't... wasn't paying people for 15 or 20 years all the money that he was paying them. He would have been out of business a lot sooner and he would have made a lot less money. I wouldn't disagree with that, Your Honor. I mean, Ponzi schemes that are successful find a way to stay afloat for a long period of time by making very, very circumspect payments to investors and continuing to draw in new money. And one of the ways they draw in new money is by making payments to investors. That's certainly true. If we'd stay with your position on the conviction, wouldn't that at least have some impact on the sentence? Because the amount of the loss taking complete aggregate does seem to exaggerate or count the same money multiple times as it's cycled back to the investors. Well, with respect to the sentencing issues, I think the one sentencing issue that is most directly impacted by Santos is the calculation of the value of the laundered funds. And the district court concluded and imposed an enhancement based on a finding that the value of the laundered funds was more than $6 million.  of more than $6 million included a couple of different things. And part of it was some money that was paid back to the investors. But if you want to look at that under the government's theory would be a promotional money laundering at $2.7 million. That would be appropriately considered as proceeds and as payback to the existing investors. There were other things within that $7 million total that would potentially be necessary expenses such as commissions to the defendant's brokers. Some of that money included commissions to the defendant's brokers. I believe that was $1.6 million. Some of that money included funds that were used to actually purchase oil and gas investments. Like in a lot of these fraud schemes, the defendant did use some of the money obtained from investors to actually do the things he said he was going to do. He just didn't do it with all of the money. He used $3.1 million of the over $10 million brought in to actually purchase oil and gas projects. So what's the point? But even if you take that out, Your Honors, I think at the end, first of all, on this issue we are under plain error. And any error would not be plain because the effect on the defendant's guideline range would only be one level. And the defendant received a sentence here that was beneath the guideline range of $262 to, I don't recall the exact top of the range, $327 months. He had a sentence of $216 months. And that $216 months sentence would be within the new guideline range of $210 to $262 months. So I think this Court can conclude that there was no plain error. With respect to the remaining sentencing issues, I should probably not jump ahead of myself. If there are any more questions about Santos or the merger problem, I'd be happy to address those. I don't see any. Thank you, Your Honor. Thank you. Thanks for coming in today. Rebuttal? I'd like to direct the Court's attention to what I think is key language in Justice Stevens' decision. And that's because he's quoting and, I think, adopting the statement by the plurality when he quotes the plurality as saying, there's no explanation for why Congress would have wanted a transaction that is a normal part of the crime and had duly considered and appropriately punished elsewhere in the criminal code to radically increase the sentence for that crime. So I think the ultimate our prior opinion here is that the dispositive one said, we remand this case to the district court for the sole purpose of correcting the court's judgment to reflect a maximum sentence of 219 months and then well, let's see, that must be maybe that's not the amyloid remand one. But anyway, there must have been another one that was the amyloid remand one. But what did it say? It was worded in those terms, i.e., it's remanded for that sole purpose. It was a typical amyloid remand language. And I want to make clear, I did not see this as an opportunity to relitigate every new appeal issue. I think Griffith is a special circumstance and it says that no matter where you are in the process and granted we're in an unusual process because it bounced up once it went back down. But if you're still in that kind of direct review process and a new rule comes down, you can do that. But whether we have the authority is one thing. But the next question is whether we have what I was going to suggest is that this is something stronger than a law of a case problem. It's a rule of mandate problem, arguably, in the sense that, could the district court, let's put it this way, if Santos had come out before the district court ruled, could you have gone to the district court and asked them to do this? I would say yes. I would cite to Griffith which said Even though we said you can only do X? I think that Griffith trumps the rule of mandate. He deserves the benefit of a new rule. And I don't think that it makes sense either by fairness or by a judicial resources perspective to say that in these unusual factual circumstances we're going to say that this particular defendant doesn't. The defendant in Moreland who recently got a vacated remand order from the Supreme Court where he hadn't raised the issue either but the Supreme Court agreed to send it back to his panel for reconsideration he gets the benefit but Mr. Van Alstyne doesn't. That doesn't seem fair and doesn't seem right to me.
judges: Hawkins, Berzon, Clifton